NUMBER 13-10-174-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 

DAVID LEONARD MCELROY
aka,

DAVID LENARD MCELROY                                                             
Appellant,

 

v.

 

THE STATE OF TEXAS,                         
                             Appellee.

                                                                                                                     
  

 

On appeal from the Criminal
District Court 

of Jefferson County,
Texas.

                                                                                                                     


 

MEMORANDUM OPINION

 

Before Justices Garza,
Benavides, and Vela 

Memorandum Opinion by
Justice Vela

                                                                                                                                    

            A jury found appellant, David Leonard McElroy
aka David Lenard McElroy, guilty of tampering with physical evidence, a
third-degree felony.  See Tex.
Penal Code Ann. § 37.09(a)(1), (c) (Vernon Supp. 2010).  After he
pleaded true to an enhancement allegation, the trial court sentenced him to ten
years’ imprisonment.  In three issues, appellant complains of Batson
error, and he challenges the legal and factual sufficiency of the evidence to
support his conviction.  We affirm. 

I.  Factual Background

            On April 21, 2009, while patrolling the area
around an apartment complex in Port Arthur, Texas, Officer Jonathan Green saw a
Lexus that was not parked in a designated place in the complex’s parking lot. 
As he drove towards the Lexus, its headlights came on, and it exited the
parking lot, turning right onto 9th Avenue.  Officer Green stopped the Lexus
after its driver “turned without signaling.”  Officer Green recognized the
driver as appellant and saw a towel between his legs on the driver’s side
floorboard.  When he asked appellant what was under the towel, appellant picked
it up, and Officer Green “saw little white-looking rocks fall off the towel,
like small little pebbles.”  Officer Green believed this rock-like substance
was crack cocaine.  He testified that based upon his training and experience as
a police officer, he had seen crack cocaine on “[m]any occasions” and said that
this “off-white rock substance that fell out of the towel, was . . .
consistent, based upon [his] training and experience, to be that of suspected
crack cocaine.”

After appellant’s hands were handcuffed
behind his back, he was put into the back seat of Officer Green’s patrol car. 
Officer Green testified that at that time, appellant did not have anything in
his mouth.  Officer Green put the suspected crack cocaine inside an undamaged
plastic evidence bag and took appellant and the bag to the police
station, where he put appellant and the bag in an “evidence room,” leaving the
bag on top of a table.  Officer Green left the evidence room for about thirty
seconds to find someone to field test the suspected crack cocaine.  He
testified that when he put the plastic evidence bag on the table, the bag had
not been “tampered with in any way” and that the “off-white rock substances was
[sic] still inside that plastic bag when [he] left the room[.]”  However, he
stated that when he returned to the evidence room, “I saw the plastic bag that
the suspected crack cocaine was in on top of the table, and it had a hole in
it.  I saw the defendant sitting down, still handcuffed with his hands behind
his back, chewing.”

Officer Green was unable to remove the
substance from appellant’s mouth and stated that appellant’s “lips was [sic]
very white . . . .”  When appellant “passed out,” EMS took him to a hospital. 
After receiving treatment, he was taken to jail.  When the prosecutor asked
Officer Green, “[B]ased upon your reason and common sense and your training and
experience as a police officer, what did you believe happened in that . . .
evidence room when you left to go find somebody to do the field test?”, he
said, “I believe he [appellant] got up, took the evidence off the table, put it
in his mouth, and chewed a hole in it to destroy the evidence.”  Officer Green
said that based upon his training and experience as a police officer, he had a
“few” opportunities to see someone ingest crack cocaine.  When the prosecutor
asked him, “And based upon those experiences, were they consistent . . . with
having white-colored lips and the way that . . . [the] defendant was
responding, was that similar to your experience─as somebody ingesting
cocaine?”, he said, “Yes, sir.”  Officer Green did not recover any of the
suspected crack cocaine and testified that appellant’s conduct “impair[ed]
[his] ability or [his] agency’s ability to continue in its investigation into
the possession of controlled substance charge against [appellant.]”  He said
that appellant’s “actions impaired [his] ability” to test the suspected crack
cocaine.

On cross-examination, when defense
counsel asked Officer Green, “How could somebody be handcuffed behind their
back and maneuver to where they can get that baggy and get it up to their mouth
to chew a hole in it?”, he said, “[T]he table that it [the bag of suspected
crack cocaine] was on is not that high.”  He testified, “I think he maneuvered
himself, got the bag off the table, and chewed a hole in it and ate it.”  He
stated that he could not “be 100 percent positive” that nobody else was in the
evidence room with appellant at the time he left to find someone to field test
the suspected crack cocaine.  He also said there was no video surveillance of
the events that occurred in the evidence room and that “[i]t’s possible” someone
had entered the evidence room after he left.  However, he said that nothing he
did caused appellant to “pass out.”  When asked about the “texture” of the
“little rocks” found underneath the towel, Officer Green said it “was soft,
maybe like dried up mashed potatoes.”  Even though Officer Green was not sure
what the substance was that he recovered from the Lexus, he said it was not
“gravel or rocks.”

The defense did not call any witnesses
to testify at the guilt-innocence phase.

II. Discussion

A.  Sufficiency of the Evidence

In issue one, appellant argues the
evidence is factually insufficient to prove that the substance he allegedly
swallowed was cocaine.  In issue two, he argues the evidence is legally
insufficient to prove that the substance he allegedly swallowed was cocaine. 
We review his sufficiency complaints under only the standard set out in Jackson
v. Virginia, 443 U.S. 307, 319 (1979).  See Brooks v. State, 323
S.W.3d 893, 895 (Tex. Crim. App. 2010) (overruling Clewis v. State, 922
S.W.2d 126 (Tex. Crim. App. 1996)).

1.  Standard of Review

            “When
conducting a legal sufficiency review, a court must ask whether ‘any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt’─not whether ‘it believes that the
evidence at trial established guilt beyond a reasonable doubt.’”  Laster v.
State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting Jackson,
443 U.S. at 318-19) (emphasis in original).  “In doing so, we assess all of the
evidence ‘in the light most favorable to the prosecution.’”  Id.
(quoting Jackson, 443 U.S. at 319).  “After giving proper deference to
the fact finder’s role, we will uphold the verdict unless a rational fact
finder must have had reasonable doubt as to any essential element.”  Id.
at 518.  We must presume that the fact finder resolved any conflicting inferences
in favor of the prosecution and defer to that resolution.  Jackson, 443
U.S. at 326.

2.  Applicable Law

            Our review of a legal sufficiency challenge
should be examined under the principles of review for a hypothetically correct
jury charge.  Grotti v. State, 273 S.W.3d 273, 280-81 (Tex. Crim. App.
2008).  “‘Such a charge [is] one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State’s
burden of proof, or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant was
tried.’”  Villarreal v. State, 286 S.W.3d 321, 327 (Tex. Crim. App.
2009) (quoting Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App.
1997)).

Three
elements define the crime of tampering with physical evidence:  “(1) knowing
that an investigation or official proceeding is pending or in progress[;] (2) a
person alters, destroys, or conceals any record, document, or thing[;] (3) with
intent to impair its verity, legibility, or availability as evidence in the
investigation or official proceeding.”  Williams v. State, 270 S.W.3d
140, 142 (Tex. Crim. App. 2008) (citing Tex.
Penal Code Ann. § 37.09(a)(1)).  “The three elements of section
37.09(a)(1) include ‘two different culpable mental states’─knowledge and
intent.”  Id. (quoting Stewart v. State, 240 S.W.3d 872, 874
(Tex. Crim. App. 2007)).  “The statute requires the knowledge of an
investigation and the intent to impair a thing’s availability as evidence.”  Id. 
The statute envisions “an offender who intends for, but is not necessarily
aware of, the impairment of something’s role as evidence in the
investigation.”  Id. at 244.  “A person acts knowingly, or with
knowledge, with respect . . . to circumstances surrounding his conduct when he
is aware . . . that the circumstances exist.”  Tex. Penal Code Ann. § 6.03(b) (Vernon 2003).  In contrast,
“[a] person acts intentionally, or with intent, with respect . . . to a result
of his conduct when it is his conscious objective or desire to . . . cause the
result.”  Id. § 6.03(a).

The indictment alleged, in relevant
part, that on the day in question, appellant:  “did then and there, knowing
that an INVESTIGATION was IN PROGRESS, to-wit:  POSSESSION OF A CONTROLLED
SUBSTANCE, intentionally and knowingly DESTROYED a ROCK LIKE SUBSTANCE,
to-wit:  SUSPECTED COCAINE, with intent to impair its availability as evidence
in the INVESTIGATION, . . . .”  (emphasis in original).  Here, the evidence
showed:  (1) Officer Green had seen cocaine on many occasions; (2) when
appellant picked up the towel, Officer Green saw “little white-looking rocks”
fall off of it; (3) Officer Green testified that this “off-white rock substance
that fell out of the towel,” was consistent, based upon his training and
experience, to be cocaine; (4) when he returned to the evidence room, the plastic
bag that had contained the suspected cocaine had a hole in it; (5) he saw that
appellant was “chewing” and that his lips were “very white”; (6) shortly
thereafter, appellant passed out, and EMS took him to the hospital; (7) Officer
Green had seen people who had ingested cocaine; (8) Officer Green did nothing
to appellant that would have caused him to pass out; (9) appellant’s conduct
impaired the Port Arthur Police Department’s ability to continue in its
investigation into the possession of controlled substance charge against him;
and (10) appellant’s actions impaired Officer Green’s ability to test the
suspected contraband.

Viewing the evidence in the light most
favorable to the verdict, a rational jury could have found beyond a reasonable
doubt that, knowing an investigation was in progress, appellant destroyed the
evidence with the intent to impair its availability as evidence in an
investigation that he knew was in progress and that he knew the evidence he
swallowed was cocaine.  See Williams, 270 S.W.3d at 142.  Issues one and
two are overruled.

B.  Batson Challenge

            In issue three, appellant argues that the
trial court erred in denying his Batson challenge to the State’s
peremptory strikes.

 

1.  Standard of Review

In Batson v. Kentucky, the United
States Supreme Court held that “the Equal Protection Clause forbids the
prosecutor to challenge potential jurors solely on account of their race.”  476
U.S. 79, 89 (1986).  To show that the State has engaged in purposeful
discrimination in the exercise of its peremptory challenges, “[t]he defendant
must demonstrate, by a preponderance of the evidence, that the prosecutor
indulged in purposeful discrimination against a member of a constitutionally
protected class in exercising his peremptory challenges.”  Watkins v. State,
245 S.W.3d 444, 447 (Tex. Crim. App. 2008).

A Batson challenge to a
peremptory strike has three steps.  Grant v. State, 325 S.W.3d 655, 657
(Tex. Crim. App. 2010).  First, an opponent of the prosecutor’s strike must
establish a prima facie showing of racial discrimination.  Id. 
Second, the proponent of the strike must state a race-neutral explanation for
the strike.  Id.  Third, the trial court must decide whether the
opponent of the strike has proved purposeful racial discrimination.  Id.


An appellate court must sustain the
trial court’s ruling with respect to the third step unless it is clearly
erroneous.  Id.; see Snyder v. Louisiana, 552 U.S. 472, 477
(2008).  “Because the trial court’s ruling requires an evaluation of the credibility
and demeanor of prosecutors and venire members, and because this evaluation
lies peculiarly within the trial court’s province, we defer to the trial court
in the absence of exceptional circumstances.”  Grant, 325 S.W.3d at 657;
see also Watkins, 245 S.W.3d at 448 (stating that “a reviewing court
should examine the trial court’s conclusion that a facially race-neutral
explanation for a peremptory challenge is genuine, rather than a pretext, with
great deference, reversing only when that conclusion is, in view of the record
as a whole, clearly erroneous”).

When applying the “clearly erroneous”
standard, an appellate court “will not disturb a trial court’s ruling unless we
are left with a definite and firm conviction that a mistake has been
committed.”  Rhoades v. State, 934 S.W.2d 113, 123-24 (Tex. Crim. App.
1996).    The Supreme Court has held that “[t]he second step of the process
does not demand an explanation that is persuasive, or even plausible.”  Purkett
v. Elem, 514 U.S. 765, 768 (1995).  Instead, “the issue is the facial
validity of the prosecutor’s explanation.  Unless a discriminatory intent is
inherent in the prosecutor’s explanation, the reason offered will be deemed
race neutral.”  Id. (quoting Hernandez v. New York, 500 U.S. 352,
360 (1991) (plurality op.)).

The court of criminal appeals has
compiled a non-exclusive list of factors that weigh against the legitimacy of a
race-neutral explanation:  (1) the reason given for the peremptory challenge is
not related to the facts of the case; (2) there was a lack of questioning to
the challenged juror or a lack of meaningful questions; (3) disparate treatment─persons
with the same or similar characteristics as the challenged juror─were not
struck; (4) disparate examination of members of the venire─i.e.,
questioning a challenged juror so as to evoke a certain response without asking
the same question of other panel members; and (5) an explanation based on a
group bias where the group trait is not shown to apply to the challenged juror
specifically.  Whitsey v. State, 796 S.W.2d 707, 713-14 (Tex. Crim. App.
1989).  In Grant, the court of criminal appeals stressed that a trial
court could consider the Whitsey factors, but these factors should not
replace the applicable standard of review.  325 S.W.3d at 659.  The court
stated that “[t]he overriding standard is still whether the trial judge’s decision
was supported by the record so that it is not clearly erroneous.”  Id.
(quoting Vargas v. State, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992)). 

            Appellant, who is African-American, complains
about the State’s strikes of venire members Adrian Bell, Justin Horace,
Demetria Nettles, Danylle Jackson, Joanna Smith, and Peggy Bowie, all of whom
are African-American.  Defense counsel represented to the trial court that
there were eleven African-American venire members on the panel and that six of
the State’s ten strikes were exercised against African-Americans.  Four
African-Americans served on the jury.

2.  The Batson Hearing

a.  Adrian Bell

            The prosecutor explained that he struck Bell
because “when the Court asked for the . . . potential jury panel to raise their
right hand and take the oath, she raised the wrong hand. . . .”  In addition,
he said that during the course of his voir dire presentation, “it appeared that
[Bell] was not following, not paying attention.”

b.  Justin Horace

            The prosecutor explained that Horace “did not
seem to be following my presentation and he seemed disinterested. . . .”  The
prosecutor further stated that he struck Horace because “I felt like there was
not a good rapport established between me and Mr. Horace. . . .”

c.  Demetria Nettles

            During voir dire examination, Nettles told
defense counsel she worked as a corrections officer for the Texas Youth
Commission (“TYC”).  When defense counsel asked her if “you’re out at the TYC
facility and you come across something that you think is contraband, either
illegal drugs or something like that[,] [w]hat kind of steps do you take to
secure that?”, she said, “First of all, I keep my eye on it, on the substance
or whatever if may be.  If I move, it goes with me.”  She also stated she would
“secure the area” and “secure my evidence.”  When defense counsel asked her,
“You certainly wouldn’t let someone that you suspect is responsible for what
may be the evidence around it, to have access to it, would you?”, she said,
“No. . . .  I need to keep my eye on it. . . .”  She stated she would not allow
inmates access to what she thought may be evidence.

At the Batson hearing, the
prosecutor stated that he wanted “the record to show that according to
[Nettles’] information sheet, . . . she does work as a corrections officer and
that she discussed in detail certain things about how they handled illegal
contraband in a correctional facility.”  He further stated “[t]hat is extremely
similar to the set of circumstances that I have in the case at bar.”

d.  Danylle Jackson

            The prosecutor stated he struck venire member
Jackson “based upon my records of criminal history showing that she had a theft
by check back in the year 1998.”  He noted that the case was dismissed after
she paid restitution.  He pointed out to the trial court that he had struck two
white venire members because one had “an alcohol violation,” and the other had
“received six months’ probation on an unlawfully carrying weapons’ charge.”

e.  Joanna Smith

            During the State’s voir dire examination,
Smith told the prosecutor that she had twice served on a criminal jury─one
case was an assault, and the other was a murder.  With respect to the assault
case, she told the prosecutor that the jury found the accused in that case “not
guilty.”  Concerning the murder case, she said that it was a hung jury.

At the Batson hearing, the
prosecutor told the trial court that he struck Smith “because when asked about
her prior criminal jury service, she indicated that no punishment was assessed
but the jury had found the defendant not guilty.”

f.  Peggy Bowie

            During the State’s voir dire, Bowie told the
prosecutor that appellant is her nephew.  After the completion of general voir
dire, the trial court excused all of the venire members, except for Bowie. 
When the trial court asked Bowie, “[I]t’s my understanding that if you were a
juror here in this case, you would just not be able to be fair and impartial
because you’re related to the defendant?”, she said, “Yeah,” and said appellant
is her brother-in-law’s son.  Upon questioning by defense counsel, she said she
could follow the trial court’s instructions and obey the law.  She told the
trial court she “would be fair,” but she also told the court, “I feel
sympathetic.  So that probably will play a part.”      

At the Batson hearing, the
prosecutor stated he struck Bowie because “she is somehow related to the
defendant; and I felt that she would be biased, prejudiced against the State of
Texas.” 

 

            At the conclusion of the Batson
hearing, the trial court overruled defense counsel’s Batson challenge,
stating, in relevant part:  “the Court finds that . . . the defense has not met
its burden in a prima facie case that the purpose that the prospective jurors
were eliminated were the basis of race.”  The court further stated that even
“if there was a prima facie case, then the State has met its burden in
providing neutral reasons that are clear and specific that show that there was
not intentional discrimination on behalf of voir dire.”

C.  Analysis

“We review the record of a Batson
hearing and the voir dire examination in the light most favorable to the trial
court’s ruling”.  Young v. State, 283 S.W.3d 854, 866 (Tex. Crim. App.
2009).  Because the trial court conducted a Batson hearing, we must
presume appellant made a satisfactory prima facie case of purposeful
discrimination.  See Watkins, 245 S.W.3d at 447; see also Hernandez,
500 U.S. at 359.  The standard of review imposes a heavy burden on appellant to
show that the trial court clearly erred by denying his Batson challenge
to the State’s peremptory strikes.  See Gibson v. State, 144
S.W.3d 530, 534 (Tex. Crim. App. 2004) (stating that a court of appeals can
reverse a judgment for a Batson violation only when the trial court's
ruling on the Batson challenge is clearly erroneous).  Appellant did not
show that the State had a disparate questioning strategy or treated other
venire members differently based on similar responses to individual
questioning.  The factor relating to group bias is irrelevant to this case
because the prosecutor did not expressly assert that any group bias motivated
his strikes.  See id.  We note that the prosecutor struck Adrian Bell
because Bell “was not following, not paying attention” to his voir dire presentation. 
The prosecutor stated that he struck Justin Horace because he:  (1) seemed
disinterested; (2) did not seem to be following his voir dire presentation; and
(3) a good rapport was not established between him and Horace.  Because the
prosecutor’s reasons for striking Bell and Horace are based upon the
prosecutor’s observations, the trial court is in the best position to determine
whether a prosecutor’s facially race-neutral explanation for a peremptory
strike is genuinely race-neutral.  Id.  Furthermore, the court of
criminal appeals has “held that the reason for a peremptory strike need not
actually turn out to be correct.”  Grant, 325 S.W.3d at 660 (citing Johnson
v. State, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002)).  Bowie was struck
because she was related to appellant by marriage.  Thus, there is a foundation
in the record for the trial court’s ruling that this explanation was not a
pretext for discrimination.  See id.[1] 
In addition, the prosecutor’s explanations for the remaining strikes provided a
foundation in the record for the trial court’s ruling that the explanations
were not a pretext for discrimination.  See id.  The credibility of a
prosecutor’s representations about his or her “information and suspicion is a
matter particularly within the trial court’s province.’”  Id. (quoting Snyder,
552 U.S. at 477).  The correctness of the prosecutor’s “suspicion” is
irrelevant.  Id. (citing Johnson, 68 S.W.2d at 649).  The record
before us does not demonstrate that the State’s explanations of its strikes
were motivated by race.  After reviewing all of the evidence in the light most
favorable to the ruling, we hold that the appellate record does not demonstrate
that the trial court’s denial of the Batson challenge was clearly
erroneous.  Issue three is overruled.

III. Conclusion

            We affirm the trial court’s judgment.

 

                                                                                         ROSE
VELA

                                                                                         Justice

 

Do not publish.

Tex.
R. App. P.
47.2(b).

 

Delivered and filed
the

3rd day of February,
2011.

 

 

 









[1]In Grant v. State, the State
explained that it struck venire member Franklin because a response on
Franklin’s questionnaire led the State to believe that Franklin’s wife knew the
defendant’s girlfriend.  325 S.W.3d 655, 660 (Tex. Crim. App. 2010).  The trial
court had before it Franklin’s written answer, the record of the entire voir
dire, and the two prosecutors’ representations that they had certain
information about the defendant’s girlfriend and suspected a relationship to
Franklin’s wife.  Id.  The court stated, “[t]hus there was a foundation
in the record for the trial court’s ruling that the explanation was not a
pretext for discrimination.”  Id.